**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Sonia Sorto,<br><br>          Plaintiff,<br><br>v.<br><br>City of Crystal, and<br>Derrick Hacker in both his individual<br>capacity and his official capacity as a police<br>officer employed by the City of Crystal,<br><br>          Defendants. | Case No.: 0:23-cv-246<br><br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1.  This action arises out of violations of the Driver's Privacy Protection Act 18 U.S.C. § 2722 ("DPPA") *et seq.* by Defendants City of Crystal ("Defendant City") and Defendant Derrick Hacker in both his individual capacity and his official capacity as a police officer employed by the City of Crystal ("Defendant Hacker") as its employee, in their illegal access, use, and dissemination of protected private driver's license and motor vehicle information from Plaintiff.

2.  "The DPPA was passed in reaction to a series of abuses of drivers' personal information held by government. The 1989 death of actress Rebecca Schaeffer was a prominent example of such abuse. In that case, a private investigator, hired by an obsessed fan, was able to obtain Rebecca Schaeffer's address through her California motor vehicle record. The fan used her address information to stalk and to kill her. Other incidents cited by Congress included a ring of Iowa home robbers who

targeted victims by writing down the license plates of expensive cars and obtaining home address information from the State's department of motor vehicles." https://epic.org/dppa/ last accessed January 5, 2023.

3. In *Condon*, the United States Supreme Court upheld the constitutionality of the Driver's Privacy Protection Act as a proper exercise of Congress' authority to regulate interstate commerce under the Commerce Clause. *Reno v. Condon*, 528 U.S. 141 (2000).

4. This is an action for injunctive relief and money damages for injuries sustained when Defendant Hacker as an employee of Defendant City illegally viewed Plaintiff Sonia Sorto's private, personal, and confidential driver's license information without a legitimate law-enforcement purpose at least 60 times between Feb 13, 2019, and June 22, 2021.

## JURISDICTION

5. Jurisdiction of this Court arises under 18 U.S.C. § 2724(a) and 28 U.S.C. § 1367 for any pendent state law claims.

6. Venue is proper because the acts and transactions occurred here, Plaintiff resides in Minnesota, and Defendant City is physically located here and, at all times relevant to this action, Defendant Hacker was employed by the city of Crystal as a licensed police officer.

## PARTIES

7. Plaintiff Sonia Sorto (hereinafter "Plaintiff") is a natural person who resides in the State of Minnesota and is a "individual" as that term is defined by 18 U.S.C. §

2724(a) or a person affected by a violation of that law.

8.    Plaintiff has suffered an injury in fact that is fairly traceable to Defendant Hacker and Defendant City's conduct and that is likely to be redressed by a favorable decision in this matter.

9.    Defendant City of Crystal is a home rule charter city in Minnesota, which can be sued under Minn. Stat. § 466.01 et seq., headquartered at City Hall, 4141 Douglas Dr. N., Crystal, Minnesota 55422.

## **FACTUAL ALLEGATIONS**

10.    Lieutenant Derrick Hacker ("Defendant Hacker") was at all times material herein, a citizen of the United States and resident of the State of Minnesota, duly appointed and acting in his individual capacity and in his capacity as a licensed police officer employed by Defendant City.

11.    Defendant Hacker was first employed as a patrol officer at the Defendant City's Police Department ("CPD") on May 3, 1999, and has held 6 different job titles with the agency over the past 23 years.

12.    Defendant Hacker was employed with the Defendant City's CPD with the rank of Lieutenant holding a mid-level management position and assigned to criminal investigations.

13.    On June 23, 2021, a person contacted the CPD to complain that one of their officers, Defendant Hacker, had unexpectedly shown up at her former boyfriend's home on June 22, 2021, asking the whereabouts of Plaintiff.

14. Defendant Hacker stated that he was investigating an identity theft case involving Plaintiff.

15. The person that Defendant Hacker spoke with was suspicious because Defendant Hacker had previously been romantically involved with Plaintiff from 2014 to 2016.

16. Thereafter, this person made a complaint to the Defendant City's police department which was thereafter investigated.

17. Defendant City's deputy police chief thereafter checked Defendant Hacker's desk at police headquarters and found several handwritten notes pertaining to Plaintiff, including phone numbers, as well as a printout of driver's license and vehicle information about Plaintiff that had been obtained from a secure website belonging to the Minnesota Department of Driver and Vehicle Services (DVS).

18. DVS is a government entity which maintains a website of confidential, government data on Minnesota drivers and vehicles that only authorized users may access.

19. Law enforcement officers in Minnesota can be authorized to access the website, but they must first receive specialized training and certification and any use of the website by an officer must be limited to official police business.

20. When users like Defendant Hacker log onto the website, they receive an automated message that any misuse of website data may result in criminal prosecution under Minnesota Statute §609.891.

21. Defendant Hacker was certified to use the DVS website which was only to be used for official police business.

22. DVS website data is stored in mainframes at the DVS headquarters, located in the City of St. Paul, Ramsey County, Minnesota.

23. Data on individuals, drivers, and vehicles in the database is categorized as "not public" under the Minnesota Data Practices Act, Minnesota Statutes Chapter 13. Section 13.09 of the Data Practices Act criminalizes unauthorized access of not public data.

24. The Minnesota Bureau of Criminal Apprehension (BCA) assigned an investigator to determine if Defendant Hacker had misused the DVS website to search for information on Plaintiff.

25. The BCA investigator learned that the Defendant City's CPD had no open identity theft cases involving Plaintiff.

26. The BCA investigator found 60 DVS queries from Defendant Hacker's password and username pertaining to Plaintiff that had been conducted between February 13, 2019, and June 22, 2021.

27. The DVS driver's license queries included the following:

- February 13, 2019: 4 queries, including queries of Plaintiff's name, driver's license demographics, driving record, and driver's license number.

- February 27, 2019: 12 queries, including Plaintiff's name, driver's license demographics, identification number, driver's license number, driving record, and license plate numbers of vehicles owned by Plaintiff.

- May 14, 2019: 7 queries, including Plaintiff's name, driver's license number, and vehicle plate numbers linked to Plaintiff.

- July 16, 2019: 4 queries, including Plaintiff's name and driver's license number.

- October 16, 2019: 11 queries, including Plaintiff's name, identification number, driver's license number, and plate numbers linked to Plaintiff.

- May 7, 2021: 10 queries, including Plaintiff's name, driver's license number, driver's license demographics, and plate numbers linked to Plaintiff.

- May 12, 2021: 4 queries, including Plaintiff's name, driver's license number, and plates linked to Plaintiff.

- June 22, 2021: 8 queries, including Plaintiff's driver's license number, and plates linked to Plaintiff.

28. The BCA investigator later interviewed Plaintiff and confirmed that she knew Defendant Hacker and that she had been in a romantic relationship with him in the past.

29. Plaintiff said that she had gone through some hard times in the past and Defendant Hacker would show up periodically at her house, unannounced.

30. Plaintiff did not love Defendant Hacker, but believed that Defendant Hacker was attracted to her.

31. Plaintiff had not spoken to Defendant Hacker since 2017 and she moved several times since then.

32. Plaintiff told the investigator that she had never reported an identity theft case to police and that she never gave Defendant Hacker permission to access her DVS information.

33. The investigator checked all Crystal police contacts with Plaintiff and found no police calls related to identity theft for which Defendant Hacker could have plausibly relied upon to justify the permissible access of the Plaintiff's protected driver's license information.

34. On August 27, 2021, the BCA investigator interviewed Defendant Hacker in an out-of-custody setting.

35. The BCA investigator informed Defendant Hacker that she was conducting a criminal investigation of his DVS queries of Plaintiff.

36. In the interview, Defendant Hacker acknowledged that he knew that accessing DVS data for non-work reasons was a misdemeanor offense.

37. Defendant Hacker did not deny making DVS queries regarding Plaintiff but said that he had been following up on a tip-line call to Defendant City's CPD about stolen mail and identity theft.

38. The BCA investigator made an extensive search of all of Defendant City's CPD records for Plaintiff and found no mail theft or identity theft cases linked to Plaintiff.

39. The BCA investigator also checked recent tip-line calls for Defendant City's CPD and found none related to Plaintiff and none related to identity or mail theft in general.

40. According to the criminal complaint filed against Defendant Hacker, his attorney told the investigator that Defendant Hacker had been working on a voter fraud case.

41. The BCA investigator again searched Defendant City's CPD records but found no voter fraud cases involving Plaintiff.

42. Following the BCA's investigation of Defendant Hacker, on April 26, 2022, the State of Minnesota charged Defendant Hacker with an 18-count criminal complaint for his repeated unauthorized of access of Plaintiff's driver's license records. See Ramsey County Court file No. 62-CR-22-2295.

43. The Minnesota Driver and Vehicle Services Division ("DVS") of the DPS maintains a database containing the motor vehicle records of Minnesota drivers. ("DVS Database").

44. The DVS Database contains "personal information" and "highly restricted personal information," as defined by 18 U.S.C. § 2725 ("Private Data"), including but not limited to names, dates of birth, driver's license numbers, addresses, driver's license photos, weights, heights, social security numbers, various health and disability information, and eye colors of Minnesota drivers.

45. Defendant Hacker, an employee of Defendant City of Crystal, impermissibly accessed Plaintiff's Private Data at least 60 times.

46. All the above accessed were committed knowingly and impermissibly.

47. Plaintiff has committed no crimes that would justify any of the above alleged accesses or the accesses cited herein.

48. Defendant City knowingly provided Defendant Hacker with access to the DVS Database that included Plaintiff's Private Data.

49. Defendant City had the ability to determine that drivers' license information, including Plaintiff's Private Data, was being accessed on multiple occasions by Defendant Hacker without a permissible purpose.

50.     Defendant City had the ability to prevent Defendant Hacker from making unauthorized access to the DVS Database, including his unauthorized access to Plaintiff's Private Data.

51.     Defendant City failed to prevent Defendant Hacker from making repeated unauthorized access to the DVS Database, including access to Plaintiff's Private Data.

52.     Defendant City knowingly authorized, directed, ratified, approved, permitted, committed, or participated in the disclosure of Plaintiff's Private Data.

53.     The policy of the State of Minnesota is to uphold the provisions of the law, both state and federal, and to protect and safeguard the privacy rights of the State's citizens and inhabitants, including its drivers' privacy rights, and including those rights that are required to be protected by federal law.

54.     Defendant City allowing individuals like Defendant Hacker to access the DVS Database without a permissible reason is a breach of confidentiality.

55.     In particular, it is the policy of the State of Minnesota, as outlined in Minn. Stat. § 171.12, subd. 7, to comply with the provisions and requirements of the DPPA.

56.     This policy is also set forth in the driver's license application and set forth in statutory language with proper citation to that federal statute.

57.     Defendant City knowingly disclosed Plaintiff's Private Data and violated state policy by failing to oversee and properly supervise access to the DVS Database that failed abysmally to uphold the privacy rights of Plaintiff as protected by the DPPA

58. Defendant City's failure exposed Plaintiff's private information to impermissible and knowing accesses by Defendant Hacker.

59. Defendant City knew that Defendant Hacker was accessing Plaintiff's private information which constitutes a knowing disclosure of her information within the meaning of the DPPA.

60. Defendant City failed to properly track and log each access of Plaintiff's private information to timely determine whether such access was permissible and authorized under the under the DPPA.

61. Defendant City's access system for the DVS database permitted Defendant Hacker to access the system without any accountability.

62. In failing to properly implement, maintain, and monitor Defendant Hacker's access to the DVS Database, Defendant City failed to follow Minnesota state policy and violated the DPPA by permitting knowing misuse of this protected data over more than two years and at least 60 illegal accesses of Plaintiff's private motor vehicle and driver's license information.

63. Many viable methods were and are available to Defendant City to prevent this illegal access of DVA database private information, but Defendant City failed to properly implement any of them.

64. Proper monitoring and auditing of access to the DVS database by Defendant City of its employees like Defendant Hacker would have undoubtedly detected these illegal accesses immediately, and certainly before 60 illegal inquiries had been performed over 28 months.

65. The information contained in the DPS database is far greater and contains more private personal information than is customarily known to non-law enforcement personnel, and includes the social security numbers of the drivers, as well as health information.

66. For example, Minnesota Administrative Rules § 7410.2610 requires disclosure of diabetic information by a driver and Minnesota Administrative Rules § 7410.2500 requires disclosure of a driver's history of seizures, while Minnesota Statute § 171.13 allow for a record of "other physical or mental examinations" for the purpose of driver's license application.

67. Information such as those provided pursuant to Minn. Admin. Rules §§7310.2610 and 2500, and Minn. Stat. §171.13 are disclosed in confidence to the DPS.

68. These accesses by Defendant City's employee Defendant Hacker were committed surreptitiously, and without the knowledge of the Plaintiff.

69. Defendant City acquiesced, facilitated, approved, or simply ignored the conduct of Defendant Hacker in accessing the Plaintiff's private information in violation of the DPPA until a suspicious citizen made a police report.

70. Defendant City was reckless in its supervision of Defendant Hacker by allowing to access the DVS database to view Plaintiff's private information without a permissible purpose under the DPPA.

71. Defendant City was grossly negligent in its supervision of Defendant Hacker in allowing to access the DVS database to view Plaintiff's private information without a permissible purpose under the DPPA.

72.    Learning the true extent of this massive invasion of her privacy made Plaintiff feel victimized, nervous, angry, and anxious.

73.    Whatever training, monitoring, or inquiry into Defendant Hacker's usage of the DVS information systems that was adopted was woefully inadequate to ensure that access is used properly and lawfully.

74.    Defendant City maintained inadequate and inappropriate policies or lax enforcement of these policies which allow for these intrusions into Plaintiff's private information in the DVS database by Defendant Hacker.

75.    Defendant City's system for accessing accountability and responsibility was and is prone to error and fails to protect drivers' private information like Plaintiff's.

76.    When Defendant City's employee Defendant Hacker viewed Plaintiff's private information in the DVS database 60 times, he did not do so to carry out official police functions.

77.    Plaintiff committed no crimes that would authorize the unauthorized access of her private driver's license information.

78.    Plaintiff made no police reports to Defendant City's CPD, Defendant Hacker, or anyone else which justified the access of her private data on these 60 separate occasions over 28 months.

79.    Defendant City's employee Defendant Hacker obtained Plaintiff's private information from the DVS database without probable cause or reasonable suspicion to believe that Plaintiff had engaged in any criminal activity, or any activity even remotely related to criminal activity.

80. Plaintiff never waived the protections of the DPPA with respect to Defendant City or its employee Defendant Hacker.

81. Plaintiff never authorized Defendant City or its employee Defendant Hacker to access her private information from the DVS database.

82. Plaintiff has been harmed by these invasions of her privacy and has suffered concrete harm because of the emotional distress connected to learning about the illegal accesses of her private data.

83. Plaintiff is concerned now because Defendant Hacker, a law enforcement officer, has been using surreptitious methods to track her whereabouts for years through these accesses to the DVS database in light of their prior romantic relationship which ended more than five years ago.

84. Recently, Plaintiff also learned that, upon good faith information and belief, Defendant Hacker was a married person at the time she was seeing him, a fact unknown to her at the time of her extended relationship with him and which has added to her concern and upset over the fact that he accessed her private data following the end of their relationship.

85. Plaintiff has a right to her privacy and personal safety and Defendant City's failure to properly oversee access to and usage of the DVS database by Defendant Hacker has left her embarrassed, upset, and confused by these multiple intrusions into her private driver's license data in violation of the DPPA.

### *Violations of the Federal Driver's Privacy Protection Act ("DPPA")*

86. The DPPA was enacted in response to growing concerns over the ease with which stalkers and other criminals could obtain personal information from state departments of motor vehicles. *Reno v. Condon*, 528 U.S. 141, 143–44, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000).

87. The DPPA states:

> (a) Procurement for unlawful purpose. – It shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title.
>
> (b) False representation. – It shall be unlawful for any person to make false representation to obtain any personal information from an individual's motor vehicle record.

18 U.S.C. § 2722.

88. The DPPA also states:

> "personal information" means information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code) [and] telephone number . . . .

18 U.S.C. § 2725(3).

89. The DPPA further states:

> A person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter, shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court.

18 U.S.C. § 2724(a).

90. The DPPA enumerates the only "permissible uses" for which personal information may be obtained. 18 U.S.C. § 2721(b).

91. To establish a violation of the DPPA, a plaintiff must show that a Defendant City and/or Defendant Hacker (1) knowingly (2) obtained, disclosed or used personal information, (3) from a motor vehicle record, (4) for a purpose not permitted. *McDonough v. Anoka Cty.*, 799 F.3d 931, 945 (8th Cir. 2015).

92. Remedies for a DPPA violation include "actual damages, but not less than liquidated damages in the amount of $2,500;" punitive damages for "willful or reckless disregard of the law;" attorneys' fees and litigation costs; and appropriate preliminary and equitable relief. 18 U.S.C. § 2724(b).

93. Plaintiff owns and has registered licensed motor vehicles within the State of Minnesota under her name, the information about which is a "motor vehicle record" as that term is defined by 18 U.S.C. § 2725(1) ("motor vehicle record" means any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles).

94. Plaintiff possesses a Minnesota Driver's License whose personal information the information about which is a "motor vehicle record" as that term is defined by 18 U.S.C. § 2725(1).

95. Defendant City and its employee Defendant Hacker did not have a "permissible use" under the DPPA to obtain, disclose or use personal information regarding Plaintiff.

96. Defendant City and its employee Defendant Hacker used the DPS database to obtain, disclose and use personal information regarding Plaintiff.

97.  Defendant City and its employee Defendant Hacker made a false representation to the provider of the database to obtain personal information regarding Plaintiff from Plaintiff's motor vehicle records.

98.  Defendant City and its employee Defendant Hacker knowingly obtained, disclosed, and used Plaintiff's personal information, from a motor vehicle record, for a purpose not permitted under the DPPA, and with willful or reckless disregard for the law.

99.  Defendant City and its employee Defendant Hacker had no "permissible use" as the phrase is defined in the DPPA to obtain, use or disclose Plaintiff's personal information obtained from the database(s).

100.  Defendant City and its employee Defendant Hacker did not have Plaintiff's consent, permission, authorization, or waiver to obtain their personal information from the database.

101.  A civil action under the DPPA may be commenced within four years after the cause of action accrues. 28 U.S.C. § 1658(a); *Rasmusson v. Chisago County*, 991 F.Supp.2d 1065, 1079 (D.Minn. 2014).

102.  Defendant City and Defendant Hacker each have intentionally and willfully violated the DPPA.

103.  As an actual and proximate result of the acts and omissions of Defendant City and Defendant Hacker Plaintiff has suffered actual damages and injury, including but not limited to, mental anguish, emotional stress, acute embarrassment, anxiety, frustration, and upset, for which Plaintiff should be compensated in an amount to be established at trial of not less than $2,500 per violation of the DPPA, punitive

damages for these knowing violations of the law, and reasonable attorney's fees in connection with enforcing her privacy rights granted under the DPPA.

104. The above-described conduct by Defendant City and Defendant Hacker were done in violation of numerous and multiple provisions of the DPPA.

105. These violations by Defendant City and Defendant Hacker were knowing, willful, negligent and/or intentional, and Defendant City did not maintain procedures reasonably adapted to avoid any such violations.

106. Defendant City's conduct with respect to Plaintiff caused Plaintiff to suffer concrete and particularized harm because the DPPA provides Plaintiff with the legally protected right to have her private information in her driver's license and motor vehicle information protected, which right was violated repeatedly to her detriment as described herein.

### Defendant City's Vicarious Liability for Conduct by Defendant Hacker

107. The acts and omissions herein of the individuals employed by Defendant City, Defendant Hacker and the other persons employed as agents of Defendant City who obtained, used and/or disclosed Plaintiff's private information as further described herein, were committed within the time and space limits of their agency relationship with their principal, the Defendant City.

108. The acts and omissions by these individual employees were incidental to, or of the same general nature as, the responsibilities these employees including Defendant Hacker were authorized to perform by Defendant City in carrying out investigative law enforcement duties.

109.  By committing these acts and omissions against Plaintiff, these individuals including Defendant Hacker and these were in part motivated to benefit their principal, Defendant City.

110.  Defendant City is directly and vicariously liable for the conduct of Defendant Hacker with respect to Plaintiff because it occurred within the scope of his employment as a police officer for the Defendant city and Defendant Hacker had apparent, or actual, authority to access Plaintiff's personal information by virtue of his employment as a police officer employed the Defendant City. *See Rollins v. City of Albert Lea*, No. 14-CV-299 (SRN/HB), 2016 WL 6818940, at *12 (D. Minn. Nov. 17, 2016).

111.  Defendant City is therefore vicariously liable to Plaintiff for the intentional and negligent acts, errors, and omissions done in violation of state and federal law by Defendant Hacker and its other employees, including but not limited to violations of state and federal law, as further described herein.

**TRIAL BY JURY**

112.  Plaintiff is entitled to and hereby respectfully demands a trial by jury on all issues so triable.

**CAUSES OF ACTION**

**COUNT I.**

**VIOLATION OF THE DRIVER'S PRIVACY PROTECTION ACT ("DPPA")**

**18 U.S.C. §§ 2721-2725 *et seq.***

113.  Plaintiff incorporates by reference all of the above paragraphs of this Complaint as

though fully stated herein.

114. The foregoing acts and omissions of Defendant City and its agents constitute numerous and multiple violations of the DPPA including, but not limited to, each and every one of the above-cited provisions of the DPPA, 18 U.S.C. § 2721-2725 *et seq.*, with respect to Plaintiff.

115. Plaintiff provided personal information to the Minnesota DPS including her address, color photograph, social security number, date of birth, weight, height. and eye color for the purpose of acquiring and utilizing a State of Minnesota driver's license, all of which is protected information under the DPPA.

116. The DPS Database also maintained Plaintiff's driving record which is also protected information under the DPPA.

117. Plaintiff did not provide her consent for the Defendant City, Defendant Hacker, or its employees to obtain, disclose or use, her private information for anything but official law-enforcement business.

118. Intentionally obtaining, disclosing, or using Private Data without an authorized purpose is a violation of the DPPA, providing for civil penalties. 18 U.S.C. §§ 2723, 2724.

119. The DPPA provides redress for violations of a person's protected interest in the privacy of Plaintiff's motor-vehicle records and the identifying information therein.

120. Defendant City has invaded Plaintiff's legally protected interest under the DPPA.

121. Defendant City through its employee knowingly disclosed Plaintiff's private personal information from her driver's license for purposes not permitted under the DPPA.

122. Defendant City through its employee or employees knowingly obtained, disclosed, or used Plaintiff's personal information, from a motor vehicle record, for a purpose not permitted under the DPPA. 18 U.S.C. § 2724(a).

123. None of the Defendant City's and/or Defendant Hacker's activities fell within the DPPA's permitted exceptions for procurement of Plaintiff's private information.

124. By the actions described above, Defendant City's employee Defendant Hacker was acting within the scope of his employment when he obtained, disclosed, or used Plaintiff's personal information from the DPS Databases for an impermissible purpose.

125. Defendant City knew that its actions, errors, and omissions related to Plaintiff's private data were in violation of the DPPA.

126. Defendant City knowingly authorized, directed, ratified, approved, acquiesced in, committed, or participated in improperly obtaining, disclosing, or using of Plaintiff's private personal information in violation of the DPPA.

127. Defendant City is vicariously liable for the acts of Defendant Hacker because it knowingly gave him access to protected information for purposes not permitted under the DPPA, and that information was later specifically used by Defendant Hacker for the very harms that the DPPA sought to prevent, namely, to stalk a former "romantic" interest, Plaintiff:

-20-

> **The purpose of the Act was to prevent stalking, domestic violence, and similar crimes by discontinuing the DMV's practice of freely disseminating private and personal information to the general public.** See Margan, 250 F. Supp. 2d 78 n.4 ("[T]he DPPA was a crime fighting measure; not a general privacy protection measure."). In Margan, a police officer obtained the plaintiffs' addresses from motor vehicle records and gave them to a friend who used them to threaten, harass, and vandalize the victims. See Margan, 250 F. Supp. 2d at 66–67. In Schierts, a police officer acquired the plaintiff's address from the DMV and disclosed it to the plaintiff's former girlfriend. 868 F. Supp. 2d at 819–20. In Menghi, a police officer obtained an arrestee's phone number and made threatening and harassing phone calls to her. 745 F. Supp. 2d at 96.

*Weitgenant v. Patten*, No. CV 14-255 ADM/FLN, 2016 WL 1449572, at *7 (D. Minn. Apr. 12, 2016) (bold added).

128. In fact, Minnesota law also addresses the very type of behavior engaged in by Defendant Hacker in his capacity as a police officer working for Defendant City for more than 23 years:

> Minn. Stat. § 609.749, Subd. 2. **Harassment crimes.**
>
> …
>
> (b) A person who commits any of the acts listed in paragraph (c) is guilty of a gross misdemeanor if the person, with the intent to kill, injure, **harass, or intimidate another person**:
>
> > (1) places the other person in reasonable fear of substantial bodily harm;
> >
> > (2) places the person in reasonable fear that the person's family or household members will be subject to substantial bodily harm; or
> >
> > (3) causes or would reasonably be expected to cause substantial emotional distress to the other person.
>
> (c) A person commits harassment under this section if the person:
>
> > (1) directly or indirectly, or through third parties, **manifests a purpose or intent to injure the person, property, or rights of another by the commission of an unlawful act**;
> >
> > (2) **follows, monitors, or pursues another, whether in person or through any available technological or other means**;

…

(Bold added.)

129. Defendant City's employee Defendant Hacker clearly manifested a purpose of deliberately violating Plaintiff's right to data privacy when he made 60 illegal DPS database accesses over a period of 28 months, and thereafter arriving at the home of Plaintiff's daughter in search of Plaintiff's whereabouts—and then concocting a false "cover" story about a nonexistent identity theft investigation.

130. This conduct by Defendant City's employee could hardly be less intimidating to Plaintiff and her family, as evidenced by the police report made about it, and was precisely the type of stalking behavior that the DPPA sought to prevent and for which Defendant City is vicariously liable.

131. Defendant City is also vicariously liable for Defendant Hacker's impermissible access of the DPS database in violation of the DPPA because it permitted the obviously fraudulent access to this database by this employee 60 times, over 28 months, sometimes up to 12 times in a day, with no evidence of a pending investigation of any kind related to Plaintiff.

132. Plaintiff has suffered harm because her private information has been obtained and viewed unlawfully.

133. Plaintiff has suffered harm because of the personal and professional time she has had to take to address the Defendant City's and its employees DPPA violations, including upsetting and stressful time being interviewed by a BCA investigator regarding Defendant Hacker's conduct and subsequent contacts with individuals at

-22-

the Saint Paul City attorney's office who, as the prosecutor, are obligated under state law to notify and get input from Plaintiff as the victim of a crime.

134.    Plaintiff has suffered and continues to suffer harm as a result of Defendant City's DPPA violations by virtue of the increased risk that her protected information is now in the possession of numerous law-enforcement personnel, who initially obtained it without a legitimate purpose, and that private data is in the possession of prosecutors, defense attorneys, court personnel, and other law enforcement officers, and eventually possibly before a jury and the public, all through no fault of her own.

135.    Plaintiff has further suffered harm because her private information has been obtained unlawfully and has spent her time meeting with a victim advocate and worries about retaliation as a result of the criminal case brought against Defendant City's employee Defendant Hacker.

136.    Defendant City's illegal disclosure of Plaintiff's private data potentially exposes her to stigma, stalking, discrimination, job loss, emotional distress, physical violence, or other serious harm, especially given Plaintiff previous romantic relationship with Defendant City's employee Defendant Hacker and the termination of that relationship two years before Defendant Hacker's misuse of the DPS database in violation of the DPPA.

137.    Defendant City's employee Defendant Hacker misused this protected information to stalk, harass, or otherwise cause harm by showing up in person at Plaintiff's daughter's home already, leaving Plaintiff and her daughter intimated and

frightened enough to make a police complaint about Defendant Hacker's misconduct.

138. Plaintiff has suffered and continues to suffer harm by virtue of the increased risk that her protected information is in the possession of Defendant City and its employee Defendant Hacker as ongoing evidence in his criminal case, as well as by others who did not have a proper legal purpose for such private information, and who obtained it without a legitimate purpose.

139. Defendant City through its employee Defendant Hacker willfully and recklessly disregarded the law, entitling Plaintiff to punitive damages under the DPPA against this Defendant City. 18 U.S.C. §2724(b)(2).

140. As a result of Defendant City's violations of the DPPA, Plaintiff is entitled to (1) actual damages, but not less than liquidated damages in the amount of $2,500; (2) punitive damages upon proof of willful or reckless disregard of the law; (3) reasonable attorneys' fees and other litigation costs reasonably incurred; and (4) such other preliminary and equitable relief as the court determines to be appropriate, from Defendant City and Defendant Hacker herein. 18 U.S.C. § 2724(b).

141. In addition, Plaintiff is entitled statutory damages award of at least $2,500 for each violation of the DPPA against Defendant City and Defendant Hacker. 18 U.S.C. § 2721(b)(1).

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendant City and Defendant Hacker:

- for an award of actual damages, but not less than liquidated damages in the amount of $2,500 for each violation thereof pursuant to the DPPA, 18 U.S.C. §§ 2721-2725;

- for an award of punitive damages upon proof of willful or reckless disregard of the law pursuant to the DPPA, 18 U.S.C. §§ 2721-2725;

- for an award of reasonable attorneys' fees and other litigation costs reasonably incurred pursuant to the DPPA, 18 U.S.C. §§ 2721-2725;

- for such other preliminary and equitable relief as the court determines to be appropriate, from Defendant City herein, pursuant to the DPPA, 18 U.S.C. §§ 2721-2725;

- and for such other and further relief as may be just and proper.

Respectfully submitted,

**THE BARRY LAW OFFICE, LTD**

Dated: January 30, 2023

By:  s/ Peter F. Barry
Peter F. Barry, Esq.
Attorney I.D.#0266577
333 Washington Ave No, Suite 300-9038
Minneapolis, MN 55401-1353
Telephone:  (612) 379-8800
pbarry@lawpoint.com


**SAVAGE-WESTRICK, PLLP**

Samuel A. Savage, Esq.
Attorney I.D.# 0395638
900 American Blvd. East, Suite. 241
Bloomington, MN 55420
Telephone: (651) 292-9603
Fax: (651) 395-7423

***Attorneys for Plaintiff***

## VERIFICATION OF COMPLAINT AND CERTIFICATION

STATE OF MINNESOTA        )
                                      ) ss

COUNTY OF HENNEPIN        )

Pursuant to 28 U.S.C. § 1746, Plaintiff Sonia Sorto verifies, certifies, and declares as follows:

1. I am a Plaintiff in this civil proceeding.
2. I have read the above-entitled civil Complaint prepared by my attorneys and I believe that all of the facts contained in it are true, to the best of my knowledge, information and belief formed after reasonable inquiry.
3. I believe that this civil Complaint is well grounded in fact and warranted by existing law or by a good faith argument for the extension, modification, or reversal of existing law.
4. I believe that this civil Complaint is not interposed for any improper purpose, such as to harass any Defendant(s), cause unnecessary delay to any Defendant(s), or create a needless increase in the cost of litigation to any Defendant(s), named in the Complaint.
5. I have filed this civil Complaint in good faith and solely for the purposes set forth in it.
6. Each and every exhibit I have provided to my attorneys which has been attached to this Complaint is a true and correct copy of the original.
7. Except for clearly indicated redactions made by my attorneys where appropriate, I have not altered, changed, modified, or fabricated these exhibits, except that some of the attached exhibits may contain some of my own handwritten notations.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _01-30-2023_ _____
                                         Signature

## <u>NOTICE TO PRESERVE ALL DOCUMENTS, RECORDINGS, AND TANGIBLE THINGS, AND ALL ELECTRONICALLY STORED INFORMATION ("Notice")</u>

To the Defendant(s) Above:

**As you know, this law firm has been retained to represent the Plaintiff in the above captioned matter ("Lawsuit").** As used in this notice, the terms "you" and "your" refer to the Defendant(s) above-named and their predecessors, successors, parents, subsidiaries, divisions and affiliates and its respective officers, directors, agents, attorneys, accounts, employees, partners, contractors and other persons occupying similar positions or performing any functions on behalf of Defendant(s).

**My client respectfully demands that you preserve all recordings, documents, tangible things and electronically stored information that are in anyway relevant to the Lawsuit.** A civil suit has been commenced against you by my client in the District Court herein, related to the matters described herein.

**You have a legal duty to preserve evidence in this matter.** This duty to preserve evidence exists not only after the formal commencement of litigation, but whenever a party knows or should know that litigation is reasonably foreseeable. The Minnesota Supreme Court has specifically addressed this issue:

> We have said that the spoliation of evidence is the "failure to preserve property for another's use as evidence in pending or future litigation." *Federated Mut. Ins. Co. v. Litchfield Precision Components, Inc.,* 456 N.W.2d 434, 436 (Minn.1990) (quoting *County of Solano v. Delancy,* 264 Cal.Rptr. 721, 724 n. 4 (Cal.Ct.App.1989)). Further, we have recognized that, regardless of whether a party acted in good or bad faith, "the affirmative destruction of evidence has not been condoned." *Patton,* 538 N.W.2d at 119. The duty to preserve evidence[2] exists not only after the formal commencement of litigation, but whenever a party knows or should know that litigation is reasonably foreseeable. *See id.* at 118–19. Breach of the duty to preserve evidence once such a duty arises may be sanctioned, under a court's inherent authority, as spoliation. *See id.* at 118. Here, we specifically reaffirm our rule that custodial parties have a duty to preserve relevant evidence for use in litigation. *Id.* at 116. We also reaffirm our previously stated rule that, even when a breach of the duty to preserve evidence is not done in bad faith, the district court must attempt to remedy any prejudice that occurs as a result of the destruction of the evidence. *Id.*

Miller v. Lankow, 801 N.W.2d 120, 127–28 (Minn. 2011)

**Once a duty to preserve evidence has arisen, the breach of that duty may subject a party to sanctions under a court's inherent authority as spoliation.** "Courts have long afforded redress for the destruction of evidence * * *." Federated Mut. Ins. Co. v. Litchfield Precision Components, Inc., 456 N.W.2d 434, 436 (Minn.1990).

**Much of the information that is subject to disclosure or responsive to discovery in this case may be stored on your current and former computer systems and other media and devices, including personal digital assistants, voice messaging systems, online repositories, telephone recording systems, hard drives and cell phones**.  The term Electronically Stored Information (hereinafter "ESI") should be afforded the broadest possible meaning and includes (by way of example and not as an exclusive list) potentially relevant information electronically, digitally, magnetically, optically or otherwise stored as:

- Audio and/or video records of any telephone calls and conversations made related to the events described in the Lawsuit
- digital communications (for example email, voicemail, imaging, scanning, and/or instant messaging);
- email service stores and server information (for example SQL Server, Oracle, Dropbox, Box, lotus, domino.nsf, Microsoft exchange.edb, Google Corporate Gmail, etc.);
- word processing documents (for example Microsoft Word or WordPerfect files and all drafts thereof);
- spreadsheets and tables;
- accounting application data;
- imaging and facsimile files;
- recordings of any conversations with my client;
- phone records of any calls to my client;
- databases (for example Access, Oracle, SQL Server data);
- Contact and relationship data management (for example Outlook, Ask or Interaction);
- Calendar and diary application data;
- online access data (for example temporary internet files, history files and cookies);
- presentations (for example PowerPoint and Corel presentations);
- network access and server activity logs relating to information exchanged between you and third parties, and by you with third parties;
- project management application data;
- backup and archival files;
- letters, documents, or correspondence of whatever kind related to existing loss prevention policies, and changes, updates, alterations made to loss prevention policies for the past three (3) years

**My client hereby demands that you preserve both accessible and inaccessible ESI**. This demand is reasonable and necessary.  Pursuant to the Rules of Civil Procedure, in the event of an eventual civil suit you must identify all sources of ESI you decline to produce and demonstrate why such sources are not reasonably accessible.  For good cause shown in that event, the Court may order production of ESI even if it is not reasonably accessible. Accordingly, you must preserve ESI that you deem inaccessible so as not to preempt the Court's authority.

**Preservation requires your immediate intervention.** You must act immediately to preserve potentially relevant ESI, including, without limitation, information and the earlier of a created or last modified date for ESI concerning any activity, updates, changes, alterations, or modifications to the information maintained by you related to the events described in the above-referenced lawsuit, through the date of this demand.  Adequate preservation of ESI requires more than simply refraining from efforts to destroy or dispose of such evidence.  You must immediately intervene to prevent loss due to routine operations or malfeasance and employ proper techniques and protocols to preserve ESI. Booting a drive, examining its contents or running any application may irretrievably alter the evidence contained therein and constitute spoliation of evidence.

**You are also directed to immediately initiate a litigation hold for potentially relevant ESI, documents and tangible things, and to act diligently and in good faith to secure and audit compliance with that litigation hold.** You are further directed to immediately identify and modify or suspend features of your information systems and devices, which, in routine operation, operate to cause the loss of potentially relevant ESI.  Examples of such features and operations that could result in spoliation include:

- purging the contents of email repositories by age, capacity or any other criteria
- using data or media wiping, disposal, erasure of encryption utilities or devices
- overriding erasing, destroying or discarding backup media
- reassigning, re-imaging or deposing of systems, servers, devices or media
- running antivirus or other programs affecting wholesale metadata alteration
- releasing or purging online storage repositories
- using metadata stripper utilities
- disabling server, packet or local instant messaging login
- executing drive or file defragmentation or compression programs
- shredding or other destruction of documents, routine or otherwise

**You should anticipate that your officers, employees, or others may seek to hide, destroy or alter ESI.**  This is not a concern that is unique to you or your organization.

Rather it is simply conduct that occurs with such regularity that any custodian of ESI and their counsel must anticipate and guard against its occurrence. You are directed to preserve complete backup tape sets (including differentials and incrementals) containing recordings, emails and ESI for any person involved in the activity, updates, changes, alterations, or modifications to the information maintained by you related to the events described in the above-referenced lawsuit, through the date of this demand, whether inside or outside of your organization and control. You should also take affirmative steps to prevent anyone with access to your data, systems or archives from seeking to modify destroy or hide ESI.

**As an appropriate and cost-effective means of preservation, you should remove from service and securely sequester the systems, media and devices housing potentially relevant ESI.** In the event that you deem it impractical to sequester those systems, we believe that the breadth of preservation required, coupled with the modest number of systems implicated, dictates that forensically sound imaging of the systems identified above is expedient and cost effective. As we anticipate the need for forensic examination of one or more of the systems and the presence of relevant evidence in forensically accessible areas of the drives, we demand that you employ forensically sound ESI preservation methods. Failure to use such methods imposes a significant threat of spoliation and data loss. Be advised that a conventional copy, backup or ghosting of a hard drive does not produce a forensically sound image because it only captures active, unlocked data files and fails to preserve forensically significant data.

**You should anticipate that certain ESI, including but not limited to recordings, spreadsheets and databases will be sought in the forms or form in which it was ordinarily maintained, that is in native form.** Accordingly, you should preserve ESI in such native forms and should not employ methods to preserve ESI that remove or degrade the ability to search ESI by electronic means or that make it difficult or burdensome to use that information.

**You should further anticipate the need to disclose and produce system and application metadata and act to preserve it.** System metadata is information describing the history and characteristics of other ESI. This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location and dates of creation and last modification or access. Metadata may be overwritten or corrupted by careless handling or improper preservation, including by moving, copying or examining the contents of files. As hard copies do not preserve electronic search ability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions. If information exists in both electronic and paper forms, you should preserve both the forms.

**We desire to work with you to agree upon an acceptable protocol for forensically sound preservation and can supply a suitable protocol if you will furnish an inventory and description of the systems and media to be preserved.** Alternatively, if you

promptly disclose the preservation protocol you intend to employ, perhaps we can now identify any points of disagreement and resolve them.

**A successful and compliant ESI preservation effort requires expertise.**  If you do not currently have such expertise, we urge you to engage the services of an expert in electronic evidence and computer forensics.  Perhaps our respective experts can work cooperatively to secure a balance between evidence preservation and burden that is fair to both sides and acceptable to the Court.  I am available to discuss reasonable preservation steps; however, you should not defer preservation steps pending such discussions if ESI may be lost or corrupted as a consequence of delay.  Should your failure to preserve potentially relevant evidence result in the corruption, loss or delay of production of evidence to which we are entitled, that failure would constitute spoliation of evidence.

**Please confirm in writing no later than five (5) business days from the date of this Notice, that you have taken the steps outlined in this Notice to preserve ESI and tangible documents potentially relevant to this pending action.**  If you have not undertaken the steps outlined above, or have taken other actions, please describe what you have done to preserve potentially relevant evidence.

If you retain legal counsel with respect to these matters, please direct this Notice to their immediate attention.  Thank you for your anticipated cooperation in this vital matter.